*regarded as unliquidated,* within the meaning of that term as applied to the subject of accord and satisfaction. If, when the amount of an indebtedness is in dispute, the debtor sends the creditor a check for the sum conceded by the debtor to be due, with an unsigned receipt 'in full' and a letter requesting the signing and return of the voucher, the offer of payment is to be deemed made upon the condition of its acceptance in satisfaction of the debt; and if the creditor retains the papers, and, after claiming a larger sum, and the refusal of the debtor to pay anything more, indorses and collects the check, such acceptance of the check imports an election to be bound by the condition on which it was offered, and constitutes an accord and satisfaction, which will not be affected by the creditor's subsequently sending the debtor a receipt 'on account,' unless such receipt is acquiesced in by the debtor." Nassoiy v. Tomlinson, supra.

Proper deference for the views of our highest court of review and for the decisions of the Appellate Division of this First Department requires an affirmance of the judgment in this case.

---

(156 App. Div. 810.)

## COLUMBIA–KNICKERBOCKER TRUST CO. v. MILLER.

(Supreme Court, Appellate Division, First Department. May 29, 1913.)

1. BANKS AND BANKING (§ 320*)—CLEARING HOUSES—CHECKS—PAYMENT.
     If both the bank collecting a check through the Clearing House and the bank upon which it was drawn understood that the receiving of the check through the Clearing House was not intended to constitute payment, it cannot be claimed by a payee and indorser of the check that there was a payment.
     [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 1226; Dec. Dig. § 320.*]

2. BANKS AND BANKING (§ 320*)—PAYMENT THROUGH CLEARING HOUSE.
     The several banks belonging to a Clearing House Association do not maintain agents at the Clearing House to pass upon the validity of the check going through the Clearing House, but merely examine the checks drawn against themselves after they are sent by the association to the banks. The association's constitution provides that it shall not be responsible as to exchanges between its members or balances resulting therefrom except as far as balances are paid into the Clearing House through the manager, and that between the hours of 12:30 and 1:30 p. m. the debtor institution shall pay to the Clearing House the balances against them, and, as soon after 1:30 as the amounts can be made up, the manager shall pay to the creditor members the balance due to them. *Held,* that the payment of balances by Clearing House Association is not complete until the debtor bank has had an opportunity to examine the items debited against it and has either approved such debits by acquiescence or affirmative acts.
     [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 1226; Dec. Dig. § 320.*]

3. BANKS AND BANKING (§ 320*)—PAYMENT OF CHECKS—PAYMENT THROUGH CLEARING HOUSE—"NOT GOOD."
     A check was "not good," within the meaning of Clearing House rules providing that all checks returned as not good should be returned the same day to the members from whom received, and that return of such checks for informality, not good, missent, etc., shall be made before 3 o'clock of the same day, when the bank on which it was drawn refuses to pay it, and a memorandum on a check, "assigned," together with a

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

notice of insolvency of the drawee, was a sufficient notice that the check was returned as "not good."

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 1226; Dec. Dig. § 320.*]

**4. BANKS AND BANKING (§ 140*)—PAYMENT OF CHECKS—DUTY OF DRAWEE.**

A bank is under no obligation to a payee to pay a check, being only answerable to the depositor for its refusal to pay.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 380–392, 394–397; Dec. Dig. § 140.*]

**5. BANKS AND BANKING (§ 320*)—CHECKS.**

The owner of a check cannot make a claim against the Clearing House agent of the indorsee for nonpayment upon its return by the drawee as not good.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 1226; Dec. Dig. § 320.*]

**6. BILLS AND NOTES (§ 404*)—CHECKS—PRESENTATION FOR PAYMENT.**

A check must have been presented for payment within a reasonable time, and presentation on the day following its negotiation is within a reasonable time.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1091–1099, 1101–1103; Dec. Dig. § 404.*]

**7. BILLS AND NOTES (§ 404*)—CHECKS—PRESENTMENT.**

The presentation of a check through the Clearing House, upon the bank upon which it was drawn, on the day following its negotiation, was a due presentment; the payee and drawee banks both being members of the Clearing House association.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1091–1099, 1101–1103; Dec. Dig. § 404.*]

**8. BILLS AND NOTES (§ 419*)—CHECKS—NOTICE OF DISHONOR—SUFFICIENCY.**

The return of a check presented for payment through the Clearing House with notice that the drawee was insolvent operated as a dishonor of the check.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1129–1137, 1143, 1144; Dec. Dig. § 419.*]

**9. BILLS AND NOTES (§ 404*)—PAYMENT—TIME OF PRESENTATION—"BANKING HOURS."**

The term "banking hours," as used in Negotiable Instruments Law (Consol. Laws 1909, c. 38) § 135, requiring instruments payable at a bank to be presented for payment during banking hours, would include, as applied to a bank belonging to the Clearing House Association, a time after that within which the Clearing House rules permitted the checks to be returned, sufficient to allow presentment to the bank returning the check if such presentment were necessary.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1091–1099, 1101–1103; Dec. Dig. § 404.*

For other definitions, see Words and Phrases, vol. 1, p. 699.]

Appeal from Trial Term, New York County.

Action by Columbia-Knickerbocker Trust Company against Andrew Miller. From a judgment for plaintiff, defendant appeals. Affirmed.

See, also, 149 App. Div. 685, 133 N. Y. Supp. 989.

The following is the opinion of the court at Trial Term, by Lehman, J.:

The defendant, about noon on January 18, 1910, deposited in his account in the Knickerbocker Trust Company a check drawn by the Stock Exchange

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

firm of Lathrop, Haskins & Co. on the National City Bank. The plaintiff credited the defendant with the amount of the check and then sent the check to the National Bank of Commerce, its Clearing House agent. The National Bank of Commerce included this check amongst the items which it sent on the following morning to the Clearing House. The Clearing House debited the amount of the check against the National City Bank, credited the amount to the National Bank of Commerce, and sent the check to the National City Bank. Thereafter, and about 1:30 p. m., the Clearing House, in accordance with its rules, adjusted the credits and debits existing between the banks by delivery of its Clearing House certificates. The check was received by the National City Bank through its messenger about 10:30 in the forenoon. About noon on that day the firm of Lathrop, Haskins & Co. announced from the rostrum of the Stock Exchange that it was unable to meet its obligations, and about the same time the firm wrote to the National City Bank: "We regret to state that we are forced to suspend. Assignee will be named later." Promptly thereafter the National City Bank returned the check to the National Bank of Commerce with a memorandum: "Returned to 23 (the Bank of Commerce's Clearing House number) by the National City Bank of New York, assigned." It is agreed that the word "assigned" referred to the drawers of the check and was intended as a statement of a reason for returning the check. The National City Bank at no time physically debited the amount of the check against the firm of Lathrop, Haskins & Co. The parties agree that the check was received by the National Bank of Commerce before 3 o'clock, and it was shown that they thereupon presented the check for payment to the National City Bank, protested the check for nonpayment, and mailed notice of dishonor to the defendant.

Upon these facts the plaintiff claims that the check has been dishonored by nonpayment, that it has used due diligence to obtain its payment, and that they are therefore entitled to look to the defendant as indorser of the check for reimbursement. The defendant claims that the plaintiff has failed to show conclusively either that the check was not paid or that it was presented to the National City Bank for payment within a reasonable time. Prior to the return of the check to the National Bank of Commerce the National City Bank had not personally paid over any money, nor had they debited the account of their depositor with the face of the check, nor had they unequivocally stated that the check was to be regarded as paid. The contention, therefore, that the check was paid prior to its return to the National Bank of Commerce, must rest upon the interpretation of the various prior acts of the presentation to the Clearing House, the receipt of Clearing House certificates, including a credit and debit of this check, the delivery of this check to the National City Bank, and its retention till after the firm of Lathrop, Haskins & Co. had announced its insolvency as evidencing an intent on the part of the National City Bank to actually pay the check by means of the Clearing House credits. All of these acts were performed by banks which were members of the Clearing House Association and were bound by its rules, and these rules must be considered in determining the intent of these banks, regardless of any question of whether these rules are binding upon a mere depositor in the plaintiff bank.

[1] In other words, the defendant cannot claim that the check was actually paid if both the bank collecting the check and the bank upon which it was drawn understood that the acts upon which the depositor relied to constitute payment were not intended to constitute any payment. One of the objects of the Clearing House Association is "the effecting at one place of the daily exchanges between the members thereof and the payment at the same place of the balances resulting from such exchanges." The system was evolved to overcome the difficulty of presenting great numbers of checks to the various banks of the city for payment and transporting the currency to pay these checks from one bank to the other. By the use of the Clearing House settlement each bank is saved the labor of a direct presentation of the checks to the various banks of the city, and is able to make payment of items drawn against it by the use of a minimum of cash, for it pays only the net balance found against it in favor of all the banks instead of being obliged to pay

each item separately with the consequent loss of cash while in transit and until it received payment of any items in its favor from the other banks.

The Clearing House Association undoubtedly contemplates that the items ·of exchange shall be actually paid through the Clearing House; but the question remains at what instant this payment is to be deemed complete. The individual banks do not maintain agents at the Clearing House to pass upon the validity of the checks. They examine the checks drawn against themselves only after they are sent by the Clearing House Association to the individual banks. Until that time they have not had an opportunity to pass upon the genuineness of the signature or upon the sufficiency of the depositor's account. They have not even had the opportunity to examine whether the checks debited against them were in fact drawn against them. The Clearing House Association has nothing to do with any of these matters. Its constitution provides that "the association shall be in no wise responsible in re-.gard to the exchanges between the members nor in regard to the balances resulting therefrom, except so far as such balances shall be paid into the ·Clearing House through the manager or his assistants." The constitution provides further that "between the hours of 12:30 and 1:30 p. m. the debtor institutions shall pay to the manager at the Clearing House the balances against them," and that "at 1:30 o'clock p. m., or as soon thereafter as the amounts can be made up, provided all the balances due from debtor mem-.bers shall have been paid, the manager shall pay the creditor members the balances due them, respectively." Finally, the constitution provides that "errors in the exchanges and claims arising from the return of checks or from any other cause are to be adjusted directly between the members which are parties thereto and not through the Clearing House, the association being in no way responsible in respect to them."

[2] It seems to me that a fair interpretation of these rules is that the payment of balances by the Clearing House Association is merely a tentative payment of items debited against any individual bank, and that the payment is not to be deemed complete until the debtor bank has had an opportunity to examine the items debited against it and has either by silence or affirmative act approved of this debit. So far as concerns checks which .are actually not good or missent, there can be no doubt that the individual banks have the right to retract any payment made in their behalf up to 3 p. m., for the constitution provides that "all checks, drafts, notes or other items in the exchanges returned as 'not good' or missent shall be returned the same day directly to the member from whom they were received, and the ·said member shall immediately refund to the member returning the same the amount which it had received through the Clearing House for the said checks, drafts, notes or other items so returned to it in lawful money or in Clearing House certificates," and the rules provide that "return of checks, drafts, ·etc., for informality, not good, missent, guarantee of indorsement or for any other cause should be made before 3 o'clock of the same day." By virtue ·of these sections of the constitution and rules the individual bank had a right to return any check marked "not good" or missent to the creditor bank .and claim the sum which had been debited against it, subject, of course, to the right of the creditor bank to enforce any right which it might have against the debtor bank on the instrument itself. In other words, the payment of the Clearing House balance may be retracted and repayment be demanded, .and the creditor bank then left to any remedy which it might have in law to enforce payment of the repudiated item.

[3] The defendant, however, contends that these sections of the constitution do not apply except where the item returned is returned as "not good" or "missent," and that they do not apply in this case because the check bore only the memorandum "assigned," and there is no proof that the drawer did not have sufficient funds in the bank until the close of banking hours, for no petition in bankruptcy was filed and no receiver appointed until after that hour. I cannot agree with that contention. The mere fact that the check did not bear the words "not good" is immaterial so long as it was returned with the intimation that the bank upon which it was drawn would refuse to honor it.

[4] A bank of deposit is under no obligation to the payee of the check to pay any check drawn against it. So far as he is concerned it may capriciously refuse to pay the check and be answerable, not to him, but to the depositor. The check is in fact "not good" when the bank refuses to certify or pay it for any reason whatsoever. It could hardly be contended that the bank on which this check was drawn was under any obligation to pay the check if the depositor had ordered payment stopped, and in effect it seems to me that the notice of insolvency was intended as a notice to stop payment of all checks coming due thereafter, and the memorandum on the check containing the word "assigned" was a sufficient notice to the collecting bank that the check was returned as "not good."

[5] It is true that there is no proof that up to the time of the notice of insolvency the National City Bank had any intention of returning the amount tentatively paid on this check, or that the check up to that time was in fact "not good"; but, on the other hand, the City Bank had performed no unequivocal act in recognition of the validity of the check, such as debiting the check against the account of the drawer. Until it had performed some act of express ratification of the payment through the Clearing House or had silently acquiesced in the payment until 3 o'clock, it seems to me that it had maintained its legal right so far as the payee was concerned of declining to pay the check and thereby rendering it "not good." Any other interpretation of the obligations which the banks constituting the Clearing House Association intended to incur under the system of exchanges instituted under its constitution and rules would, in my opinion, cause unnecessary confusion, for the collecting bank could not return the amount claimed by the bank on which the check was drawn without subjecting itself to liability to its depositor, unless it could prove in a court of law that when the check came into the hands of the drawee the check was either forged or there were no funds available for its payment. The entire system of Clearing House exchanges is based upon the convenience of the constituent banks, and this convenience is arrived at only if the transactions of the Clearing House are regarded as constituting merely a tentative payment which the debtor bank may retract within the course of the banking day for any reason whatsoever. In this view the checks are to be regarded as presented to the bank by presentment to the Clearing House with the understanding that they shall not be regarded as paid until the drawee signifies its acceptance either by affirmative act or silence for a stipulated period. Only when such acceptance has been shown does the payment of the balances by the Clearing House Association constitute a payment of any individual item. Until the drawee bank has actually accepted the check it may render the check "not good" by refusing to honor it and by returning it to the bank presenting it. The National City Bank therefore had the right to return this check to the National Bank of Commerce, and it could not as between these banks be regarded as paid, nor could the Knickerbocker Trust Company, the owner of the check, make any claim against the National Bank of Commerce, and the plaintiff has therefore a right to look to the defendant, the indorser of the check, for its payment, provided it has used due diligence in presenting it and giving notice of dishonor.

[6] The plaintiff upon this branch of his case must establish that the check was presented within a reasonable time. There can be no question but that presentment on the day following its negotiation is within a reasonable time.

[7] On that day it was presented through the Clearing House to the bank upon which it was drawn, and was returned by that bank to the collecting bank. I cannot see how it can be successfully claimed that this did not constitute a due presentment and dishonor. Under the rules of the association of which both banks were members, a presentment through the Clearing House was adopted as a convenient means of making exchanges.

[8] This was therefore a proper presentment to the bank, and when the check was returned it operated as a dishonor of the check. No further presentment was therefore, in my opinion, necessary. If, however, a further presentment was necessary, I think that it was conclusively established that such presentment was made. Conceding, without deciding, that the proof that the presentment by the notary was made before 3 o'clock is not conclu-

sive, it seems to me that the proof that it was made during "banking hours," as required by section 135, is conclusive.

[9] It is true that ordinarily "banking hours" in New York are from 10 to 3; but, since the rules of the Clearing House permit the return of checks until 3 o'clock, it seems to me that the terms "banking hours" as applied to the constituent bank must receive a reasonable construction, and that it must include a time sufficient to allow presentment thereafter to the bank returning the check if in fact such presentment is necessary.

Judgment is therefore directed for the plaintiff for the sum of $4,794.44. Upon consideration I do not think that I have any right in this case to pass upon the submitted findings of fact.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGH-LIN, CLARKE, SCOTT, MILLER, DOWLING, and HOTCH-KISS, JJ.

S. H. Ordway, of New York City, for appellant.
C. H. Tuttle, of New York City, for respondent.

PER CURIAM.    Judgment affirmed, with costs, on opinion of LEHMAN, J.    Order filed.

---

(157 App. Div. 434.)

HOFFMAN et al. v. COLUMBIA–KNICKERBOCKER TRUST CO.

(Supreme Court, Appellate Division, First Department.    June 13, 1913.)

1. PLEDGES (§ 44*)—PAYMENT OF DEBT—PRESUMPTION.

It cannot be presumed, in a proceeding to attach bonds pledged, that the indebtedness for which the defendant's property was security had been paid.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 103–107; Dec. Dig. § 44.*]

2. PLEADING (§ 8*)—CONCLUSIONS.

Allegations of the complaint, in an action in which bonds owned by defendant in the principal action were pledged to the other defendant were attached, that the sheriff demanded possession of the bonds under the execution "while no legal obstacle or impediment to compliance therewith existed," did not allege that the indebtedness, to secure which the bonds were pledged, had been paid, being a mere conclusion of law.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 12–28½, 68; Dec. Dig. § 8.*]

Appeal from Special Term, New York County.

Action by Charles R. Hoffman and Julius Harburger, as Sheriff of the County of New York, against the Columbia-Knickerbocker Trust Company.    From an interlocutory judgment overruling a demurrer to the complaint, defendant appeals.    Reversed, and demurrer sustained.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGH-LIN, CLARKE, and SCOTT, JJ.

Herbert Barry, of New York City (Julien T. Davies, of New York City, on the brief), for appellant.

Edward Stetson Griffing, of New York City, for respondents.

LAUGHLIN, J.    The plaintiff Hoffman brought an action in the Supreme Court against the Toledo Interurban Construction Company,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes